IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JANE SLEEPER, ADMINISTRATOR OF )
THE ESTATE OF GRANT ROLLINS )
SLEEPER, Deceased, )
)
Plaintiff, )
)
v. ) Civil Action No. 3:12CV441–HEH
)
CITY OF RICHMOND, VIRGINIA, *et al.*, )
)
Defendants. )

## MEMORANDUM OPINION
(Denying Motion to Dismiss)

This matter is presently before the Court on Defendant City of Richmond's Motion Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff Jane Sleeper, Administrator of the Estate of Grant Rollins Sleeper, brings this action against the City of Richmond, Sheriff C.T. Woody, and various individual employees of the Richmond City Jail (collectively "Defendants") alleging multiple constitutional violations and wrongful death. The matter has been fully briefed by both Plaintiff and the City of Richmond ("the City"). The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. For the reasons set forth herein, the Motion will be granted, in part, and denied, in part.

## I. STATEMENT OF FACTS

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Plaintiff's well-pleaded allegations to be true, and views all facts in the light most favorable to Plaintiffs. *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Plaintiff's Complaint contains the following factual allegations.

Grant Rollins Sleeper ("Sleeper"), who suffered from schizophrenia, was arrested on June 14, 2010 for allegedly making threats to the Governor of Virginia and the Governor's family. After being detained, he was initially held at the Arlington County Detention Facility ("Detention Facility") before being transferred to the Richmond City Jail ("Jail") on June 16, 2010. (Compl. at ¶ 14.) Plaintiff alleges that the Detention Facility was aware of Sleeper's condition and sent numerous records to the Jail at the time of his transfer. (*Id.* at ¶ 15.) These records documented Sleeper's schizophrenia and indicated that he was potentially suicidal. (*Id.*) At the time of his intake at the Jail, an assessment performed by Deputy Olson confirmed that Sleeper had made suicide threats and was considered a suicide risk. (*Id.* at ¶ 16.)

Despite the Jail's alleged knowledge of Sleeper's schizophrenia, Defendant Sheriff C.T. Woody ("Sheriff Woody") did not house "Sleeper on the Jail's main medical tier (A3left), or on its psychiatric tier (A3Right), located in close proximity to its medical department." (*Id.* at ¶ 17.) Instead, Sheriff Woody placed Sleeper on tier A2L, an area with mandatory periodic observations by staff. Plaintiff asserts, however, that these observations were not executed according to protocol. (*Id.*)

2

The following day, on June 17, 2010, a deputy allegedly observed Sleeper bleeding from his head while in his cell and promptly notified a medical specialist at the Jail. Plaintiff claims that Melissa Sutherland, L.P.N. ("Sutherland"), a member of the Jail's Medical Department, responded to the deputy's call. After observing the gash on Sleeper's head, Sutherland cleaned the wound and referred him to an MD for possible sutures. Later that day, a Jail physician examined Sleeper, noting in his report that Sleeper recalled falling earlier in the day. (*Id.* at ¶ 19.) That evening, around 7:30 p.m., Jail employees transported Sleeper to MCV Hospital's Emergency Department for sutures. (*Id.* at ¶ 20.) Plaintiff asserts that at the time of his arrival, Sleeper's vital signs and bloodwork all registered within a normal range. Furthermore, during Sleeper's consultation with the MCV physicians, he purportedly denied any headache, numbness, weakness, chest pain, shortness of breath, or abdominal pain. (*Id.* at ¶ 22.) Sleeper was discharged from MCV later that evening to return to the Jail. At the time of his discharge, Plaintiff maintains that Sleeper "was alert and oriented, and his condition had improved." (*Id.* at ¶ 25.) Sleeper returned to a cell on Tier A2L.

On June 18, 2010, at 12:55 p.m., Deputy Allmon, while relieving another deputy from duty, discovered Sleeper unresponsive in his cell. Rather than initiate a medical emergency, Plaintiff alleges that Deputy Allmon merely alerted the Medical Department and his immediate supervisor, requesting their presence at Sleeper's cell. According to Jail records, Nurse Lewis, among other personnel, arrived at the cell ten minutes later, where Nurse Lewis found Sleeper "slumped in his bed, and was unable to find his pulse." (*Id.* at ¶ 28.) Sleeper allegedly "had a temperature of 104.5, was not responding to verbal

3

communications, was laboring to breathe, and had a blood pressure of 130/90." (*Id.*) Despite his condition, Plaintiff asserts that Jail personnel failed to administer any emergency aid to Sleeper, waiting almost fifteen minutes to call Emergency Medical Services. When the emergency medical technicians ("EMTs") arrived on the scene at 1:21 p.m., according to their records, they allegedly found "an unresponsive male in a wheelchair" and Jail employees "standing around looking at him [with] no rescue efforts being done." (*Id.* at 31, citing EMT records.)

Upon arrival, the attending EMTs intubated Sleeper and administered fluids before transporting him to MCV Hospital's Emergency Department. At the Emergency Department, a resident physician examined Sleeper and placed him in a cooling blanket. At the time of his admission, his "initial working diagnosis included: altered mental status, acute respiratory failure, acute renal failure, rhabdomyolysis, and hypotension." (*Id.* at ¶ 34.) The medical history reported to the attending physician included an observation that at the time the Jail officials discovered Sleeper, his cell was possibly "30 degrees hotter than the surrounding area." (Compl. at ¶ 33.)

Sleeper's condition continued to deteriorate over the next week, and on June 26, 2010, he died from "Environmental Heat Exposure" as detailed in his final autopsy report. According to Dr. Kevin D. Whaley, the Assistant Chief Medical Examiner who performed the autopsy, "Sleeper's body revealed 'hyperthermia,' and 'centrilobar hepatocellular necrosis, bleeding diathesis, and acute renal tubular necrosis, . . . attributable to marked increase in body core temperature with consequent multiple organ failure.'" (*Id.* at ¶ 37, citing autopsy report.)

In addition to the facts surrounding Sleeper's death, Plaintiff avers that the City of Richmond and Sheriff Woody have had knowledge of the Jail's excessive heat problem for a number of years, but have failed to implement any changes. (*Id.* at ¶ 63.) Furthermore, Plaintiff claims that the Jail lacks sufficient access to water, has a diminished air quality, and is dangerously overcrowded. (*Id.* at ¶ 65.) Plaintiff further asserts that the City of Richmond knew of the deplorable conditions within the Jail for over twenty-five years, yet has declined to take any action. (*Id.* at ¶ 63.)

Based on the foregoing allegations, Plaintiff filed a five-count Complaint in this Court against Defendants. In Count I, Plaintiff alleges that the City of Richmond, through official policies and customs, constructed and maintained the Jail in a manner reflecting a deliberate indifference to Sleeper's constitutional rights. In Count II, Plaintiff claims that Sheriff Woody and the City of Richmond, based on Sheriff's Woody's actions, violated Sleeper's constitutional rights through official policies and customs governing the operation of the Jail. Plaintiff also alleges in Counts III and IV that various "officers in the Jail Operations Department" and deputies employed by Sheriff Woody violated Sleeper's constitutional rights. (Compl. at ¶ 10.) Finally, in Count V, Plaintiff brings a wrongful death claim against Defendants Sheriff Woody, officers of Jail operations, and deputies employed by Sheriff Woody. In response, the Defendant City of Richmond filed the instant Motion to Dismiss Counts I and II pursuant to Rule 12(b)(6).

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. . . . [I]t does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Mylan Labs*, 7 F.3d at 1134.

### III. ANALYSIS

In its Motion, the City moves to dismiss both of the constitutional claims Plaintiff alleges against it. Pursuant to 42 U.S.C. § 1983, the federal civil rights statute:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983; *see generally Monroe v. Pape*, 365 U.S. 167 (1961). According to the plain language of the statute, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Westmoreland v. Brown*, 883 F. Supp. 67, 71 (E.D. Va. 1995) (internal citations and quotations omitted). Therefore, to establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the alleged injury. *See Coppage v. Mann*, 906 F. Supp. 1025, 1035 (E.D. Va. 1995).

While the Supreme Court has held that cities may be classified as "person[s]" amenable to suit under Section 1983, municipal liability may not be predicated upon a theory of vicarious liability or *respondeat superior*. *See Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 694 (1978). Instead, the Court has clarified that municipal liability under Section 1983 arises only where the municipality has undertaken an official policy or custom which causes an unconstitutional deprivation of the plaintiff's rights. *Id.*; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-84 (1986); *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987). Thus, to establish liability, a plaintiff must plead and ultimately prove that: (1) the City had a policy or custom of deliberate indifference to the

7

deprivation of constitutional rights; and, (2) this policy or custom caused the complained of injury. *See Westmoreland*, 883 F. Supp. at 76 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).[1]

In the instant Motion, the City argues that, as to Count I, Plaintiff has both failed to adequately plead a policy or custom of abuse, and failed to sufficiently allege that it was deliberately indifferent to Sleeper's care. In addressing Count II, the City contends that it cannot be held liable under § 1983 for the actions or inactions of Sheriff Woody.

### A.   Count I: Direct Allegations Against the City

Turning first to the direct allegations made against the City in Count I, Plaintiff's Complaint seeks to satisfy the "official policy or custom" requirement set forth in *Monell* by alleging that the City acted pursuant to an official policy or custom of maintaining an overheated, poorly ventilated, and otherwise inhumane Jail. (Pl.'s Mem. at 12.) "Although it is perhaps conceptually awkward to argue that the City had an official policy or custom of maintaining a Jail in the alleged state, it is fair to read the Complaint as, at least, alleging known and deliberate inaction on behalf of the City. The plausibility of this reading is important because official inaction may, in certain circumstances, qualify as an official policy or custom for purposes of *Monell*." *Brown v. Mitchell*, 308

---

[1] Through Section 1983, Congress essentially created a federal tort action for the deprivation of constitutional and statutory rights. *See Randall v. Prince George's County*, 302 F.3d 188, 208 (4th Cir. 2002). As such, there can be no claim unless the defendant had a duty to the plaintiff respecting the alleged deprivation. It is undisputed, however, that the City does have a duty, imposed by statute, to build and maintain a suitable and safe jail facility. *See* Va. Code § 15.2-1638; *Cf.* Va. Code § 53.1-71.

F. Supp. 2d 682 (E.D. Va. 2004) (citing *Milligan v. City of Newport News*, 743 F.2d 227, 229-31 (4th Cir. 1984)).

For example, in *Milligan*, the Fourth Circuit explained that:

> [A] policy or custom may . . . be inferred from continued inaction in the face of a known history of widespread constitutional deprivations . . . or, in quite narrow circumstances, from [continued inaction in the face of] . . . a general, known course of . . . conduct [having the "manifest propensity"] to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state.

*Milligan*, 743 F.2d at 229-30. Thus, the Fourth Circuit sets forth two ways in which municipal inaction may constitute a custom or policy for purposes of *Monell*: (1) when the City fails to act despite a known pattern of constitutional deprivations; or, (2) when the City fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the city. *Id.*

All official inaction, however, does not necessarily constitute a custom or policy for purposes of *Monell*. Mere allegations that the municipality failed to act when faced with an isolated or unique constitutional deprivation does not automatically imply that an official policy or custom exists. In other words, "municipal liability may not be rested simply upon a failure to adopt policies that *in retrospect* can be seen to be a means by which [a] particular [constitutional deprivation] . . . might have been averted." *Milligan*, 743 F.2d at 230 (emphasis added).

As the City aptly points out, Plaintiff's Complaint does not allege that anyone else other than Sleeper has fallen ill due to the "oppressive heat and underventiliation" at the

Jail. (Def.'s Mem. at 14.) For that reason, the City argues that the Complaint fails to allege an official custom or policy under *Monell*. Instead, the City argues that the Complaint alleges, at best, an "isolated, unprecedented incident" occurred (*Id.*)

The City's argument "ignores the settled rule that housing inmates in a grossly overcrowded and unsanitary facility violates the inmates' rights to be free from cruel and unusual punishments." *Brown*, 308 F. Supp. 2d at 693 (citing *Wilson v. Seiter*, 501 U.S. 294 (1991); *Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993)). Here, although Plaintiff's Complaint does not explicitly allege that other inmates have become sick from overheated and poorly ventilated conditions at the Jail, it does allege that "the City, by and through its policymakers, knew of the inhumane conditions at the Jail and repeatedly failed to address and rectify the situation." (Pl.'s Mem. at 14, citing Compl. at ¶¶ 38-79;) *see also Milligan*, 743 F.2d at 229-30. As specifically alleged in the Complaint and recounted in the Plaintiff's Response to the Motion to Dismiss, the "living conditions at the Jail have been deplorable for years." (Compl. at ¶ 38.) The "conditions, in addition to being reported by the press and discussed by City residents, also have been widely and publicly decried by former Jail residents, by Sheriff's Office employees, and by Defendant Sheriff Woody himself." (*Id.*) Indeed, "Defendant Woody . . . repeatedly has made public comments, pre-dating and post-dating Mr. Sleeper's death, concerning the Jail's dangerous heat problem." (*Id.* at ¶ 39.) "Framed in this fashion, the Complaint satisfies the first method outlined in *Milligan* whereby municipal inaction will constitute an official custom or policy for purposes of *Monell* because it alleges that the City

displayed continued inaction in the face of a known history of widespread constitutional deprivations." *Brown*, 308 F. Supp. 2d at 682 (citing *Milligan*, 743 F.2d at 229-30).

Plaintiff's Complaint also states a cognizable claim against the City under the second route outlined in *Milligan*. This includes situations where the City fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the City. *Milligan*, 743 F.2d at 230 (citing *Avery v. County of Burke*, 660 F.2d 111 (4th Cir. 1981)). Construing the facts alleged in a light favorable to Plaintiff, the housing of inmates in a grossly overheated and poorly ventilated facility such as that described in the Complaint "is so likely to result in inmate sickness and suffering that there is an obvious likelihood of constitutional deprivations to an identifiable group of persons having a special relationship to the municipality." *See Brown*, 308 F. Supp. 2d at 694 (citing *Milligan*, 743 F.2d at 230). Thus, the "likelihood of deprivation to those persons is so apparent and obvious that, under *Milligan*, municipal inaction, even standing alone and without a pattern of actual sickness or disease transmissions, can constitute a cognizable 'official policy or custom' for purposes of *Monell*." *Id.* (citing *Milligan*, 743 F.2d at 230.)

Sleeper, housed in the Jail as a pre-trial detainee, certainly stands in a special relationship with the City. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). Furthermore, as the Fourth Circuit articulated in *Milligan*, an overcrowded, poorly ventilated, and unsanitary jail facility has "the manifest propensity" to spread disease. *Milligan*, 743 F.2d at 230. This is the situation here,

where an overheated and poorly ventilated jail facility certainly had the same "manifest propensity" to cause heat-related illness—which allegedly led to Sleeper's death. (Compl. at ¶ 37.) Because of the patent likelihood of injury to an identifiable group of persons standing in a special relationship to the City, the Complaint reasonably characterizes the City's inaction as an official policy or custom for purposes of *Monell*, as applied in *Milligan*.

The City also moves to dismiss Count I for failure to adequately allege a constitutional violation. Pretrial detainees enjoy at least the same protections under the Fourteenth Amendment as convicted inmates have under the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Consequently, pretrial detainees have a clearly established right to the Eight Amendment's restraints on "cruel and unusual punishments," by prison officials who may not, for example, use excessive physical force against prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)). Although the text of the Eighth Amendment is limited to cruel and unusual punishments, the Amendment may also "be applied to some deprivations that were not specifically part of the sentence but were suffered during imprisonment." *Wilson*, 501 U.S. at 297. In this way, the Amendment also imposes duties on these officials to furnish humane conditions of confinement, including provision of adequate food, clothing, shelter, and medical care. Prison officials must also "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).

12

The Supreme Court has developed a two-part inquiry to determine whether the prison officials' conduct violated their duty under the Eighth Amendment to provide humane conditions of confinement. The first part of the inquiry asks whether the conditions of confinement objectively inflict harm that is sufficiently serious to deprive a prisoner of minimal civilized necessities.[2] *Farmer*, 511 U.S. at 834. The second part of the inquiry examines whether prison officials subjectively acted with "deliberate indifference to inmate health or safety," meaning that they actually knew of and disregarded the inhumane nature of the confinement. *Id.* at 837 (internal quotation marks omitted). Here, Plaintiff has pleaded sufficient facts to satisfy each prong.

Viewing the factual allegations in the light most favorable to Plaintiff, the Jail conditions and resulting harm suffered by Sleeper clearly deprived him of minimal civilized necessities. In addition to the claim that the medical examiner attributed Sleeper's death to environmental heat exposure, Plaintiff also maintains that jail personnel observed that, at the time he was discovered to be unresponsive, Sleeper's jail cell was approximately 30 degrees warmer than the surrounding environment. (Compl. at ¶ 33.) Furthermore, Plaintiff avers that temperatures in the Jail have reached extraordinary temperatures for a number of years, oftentimes approaching 120 degrees Fahrenheit. According to the Complaint, the City was obviously cognizant of the situation. Sheriff Woody explicitly recognized the heat discrepancies inside the Jail, at

---

[2] The Supreme Court has held that minimum civilized necessities should be measured against current societal standards, rather than those in effect at the time the Eighth Amendment was drafted. *See Estelle*, 429 U.S. at 102. Thus, the deprivation of medical treatments unavailable at the time of ratification may nevertheless be prohibited by the Eighth Amendment.

13

one point stating that "[i]n some areas it's 10 to 15 degrees hotter [in the Jail] that it is on the outside." (Compl. at ¶ 42.) Therefore, in line with other courts presented with similar facts, this Court finds that Plaintiff has satisfied the first prong of the constitutional inquiry. *See Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004) ("[T]he probability of heat-related illness is extreme . . . when the heat index is 90 or above"); *Brock v. Warren County*, 713 F.Supp. 238 (E.D. Tenn. 1989) (holding that the requirements of *Monell* were satisfied when jail officials "made no effort to rectify the excessive heat and lack of ventilation").

Turning next to the second part of the constitutional inquiry, Plaintiff must allege that the City (1) knew Sleeper faced a substantial risk of serious harm created by the excessive heat and (2) with such knowledge, disregarded the risk of harm by failing to take measures to abate the condition. *See Farmer*, 511 U.S. at 834. Whether a defendant had the requisite knowledge of a substantial risk is generally a question of fact. In evaluating this issue, a factfinder may infer knowledge from the very fact that the risk was obvious. *Id.*

Here, Plaintiff clearly asserts that the City had knowledge of the excessive temperatures and lack of ventilation within the Jail and, nevertheless, failed to take appropriate measures to abate the conditions. (*See* Compl. at ¶¶ 63-66.) At this early stage of litigation, Plaintiff has sufficiently alleged facts supporting his contention that the City's actions exhibited deliberate indifference to the risk of harm created by the Jails excessive climate.

## B.    Count II: The City's Liability Through The Sheriff's Policies

Finally, the City moves to dismiss Count II on the grounds that under Virginia law, the Sheriff has been granted independent authority to establish policies and procedures for the Sheriff's department. As the Court has already stated, while cities may be classified as "person[s]" amenable to suit under Section 1983, municipal liability may not be predicated upon a theory of vicarious liability or respondeat superior. *See Monell*, 436 U.S. at 694. Plaintiff argues, however, that this claim is not based upon theories of *respondeat superior* or vicarious liability, but on a theory that the City is liable "to the extent that Sheriff Woody was an official policymaker for the City." (Pl.'s Mem. at 27.)

The Fourth Circuit, however, has explicitly held that "under Virginia law, the Sheriff has been granted independent authority to establish policies and procedures for the Sheriff's department." *Strickler,* 989 F.2d at 1390 (citing *Himple v. Moore*, 673 F. Supp. 758, 759 (E.D. Va.1987) ("Under Virginia law, the Sheriff has been granted the authority to make policy for the Sheriff's Department, not for the County. Thus, while local governmental entities may be held liable under § 1983, the County is not the proper party here"); *Sherman v. City of Richmond,* 543 F. Supp. 447, 449 (E.D. Va.1982) ("Neither the City of Richmond nor the Commonwealth of Virginia is responsible for the actions of the Sheriff of the City of Richmond. . . . As a [state] constitutional officer, the

Sheriff serves independent of the municipal or county government and independent of the State government")).[3]

In reaching its conclusion in *Strickler*, the Fourth Circuit specifically emphasized the distinction between a sheriff's role and the municipality's separate obligation "to provide for the jail's physical plant." *Id.* Virginia law "at most obligates [a] city to provide for the jail's physical plant, not to oversee the activities within." *Id.* Further, "a municipality may be liable for the acts of its employees" including "lawmakers." *Id.* Thus, to the extent that a constitutional violation results from a city council's failure "to provide for the jail's physical plant," a municipality may be held liable (assuming the other *Monell* requirements are met, *supra* at Section III(A)). But if the violation results exclusively from a sheriff's neglect of his distinct duties under Virginia law, then liability cannot be imposed on the municipality.

The legal theories separately raised in Counts I and II highlight the distinction relied upon in *Strickler*. While Count I asserts liability against the City because of its failure to adequately maintain a safe, sanitary jail, Count II asserts liability because of the Sheriff's policies and procedures in operating the jail. Although Virginia law may obligate the City to provide for the physical upkeep of the Jail, it does not render the City liable for operations within—that is the sole purview of Sheriff Woody. For this reason,

---

[3] While Plaintiff cites a number of other decisions that appear to contradict *Strickler*, either implicitly or explicitly, the Fourth Circuit's decision in *Strickler* has not yet been overturned. *See, e.g., Estate of Harvey v. Roanoke City Sheriff's Office*, No. 7:06cv603, 2007 WL 602091, at *3 (W.D. Va. Feb. 23, 2007). Thus, it remains binding on this Court.

Plaintiff's claim against the City based upon Sheriff's Woody role as policymaker (Count II) must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant City of Richmond's Motion to Dismiss will be granted, in part, and denied, in part. The City's Motion will be granted as to Plaintiff's § 1983 claim against it in Count II. The City's Motion to Dismiss as to Count I, however, will be denied.

An appropriate Order will accompany this Memorandum Opinion.

                                                /s/
                                      Henry E. Hudson
                                      United States District Judge

Date: Aug. 16, 2012
Richmond, Virginia